UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony J. CAPERS, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Lisa A. JACKSON, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Darrol J. HARRISON, a/k/a Big
D, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Gregory OVERTON, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Vincent L. ROBINSON, a/k/a Boo
Boo, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Travyuis Doral COKELY, a/k/a
Tobey, a/k/a Tobey Cokely,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Peter JOHNSON, a/k/a Junior Jackson,
Defendant–Appellant.

Nos. 93–5625, 93–5664, 93–5668, 93–5669,
93–5697, 93–5699 and 93–5731.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1995.

Decided Aug. 10, 1995.

bia, SC, for appellant Harrison; Bernard F. Mack, North Charleston, SC, for appellant Overton; Daniel Beck, Asbill & Beck, Charleston, SC, for appellant Robinson; Josef Kirk Myers, Charleston, SC, for appellant Cokely. J. Preston Strom, Jr., U.S. Atty., Charleston, SC, for appellee.

Before ERVIN, Chief Judge, and MICHAEL and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Chief Judge ERVIN and Judge MOTZ joined.

OPINION

MICHAEL, Circuit Judge:

After a jury trial that lasted over two weeks, all seven appellants were convicted for conspiracy to distribute and possess with intent to distribute drugs. Five of them were also convicted for possession of drugs with intent to distribute. In addition, one of them was convicted for money laundering. Appellants raise several issues in this appeal. Finding no error, we affirm.

I. *Background*

In the fall of 1991 the Drug Enforcement Administration (DEA) initiated an investigation into cocaine and crack distribution in and around a nightclub in Ridgeville, South Carolina. With the assistance of a confidential informant, Lowell Smith, the DEA made controlled buys from the targets of the investigation. In the spring of 1992 the DEA, assisted by two additional confidential informants, Lester Williams and Hezekiah Salone, expanded its investigation to include the nearby towns of Holly Hill and Eutawville, South Carolina. Salone and Williams, too, made controlled buys.

On October 14, 1992, seventeen defendants were charged in a thirty-one count superseding indictment in the District of South Carolina. Count One charged all seventeen defendants with conspiring to distribute and possess with intent to distribute crack and cocaine, in violation of 21 U.S.C. § 846. Counts Two through Twenty charged most defendants with possession of crack and co-

**ARGUED:** William Clifford Wood, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC; Lawrence John Rosintoski, North Charleston, SC, for appellants. Benjamin A. Hagood, Jr., Asst. U.S. Atty., Charleston, SC, for appellee. **ON BRIEF:** Richard N. Buchanan, Charleston, SC, for appellant Capers; Jack B. Swerling, Colum-

caine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts Twenty–One through Thirty–One charged defendant Darrol Harrison, the putative leader of the drug distribution scheme, with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2.

Six defendants entered into plea agreements prior to trial, and one became a fugitive. The remaining ten defendants had a jury trial on March 1–4 and March 17–31, 1993. The jury rendered guilty verdicts on most of the counts before it. Seven of the ten defendants who went to trial join in this appeal.

## II. *Discovery Issues*

### A.

■ Appellants first contend that the government violated both the Jencks Act, 18 U.S.C. § 3500, and the rule set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as extended in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (impeachment evidence), by failing to disclose a notebook kept by informant Salone, a major government witness at trial. For the reasons discussed below, we disagree.

In early 1992 Salone began writing in a spiral notebook a detailed daily log of the various drug activities he observed as an informant in this case. Salone kept the notebook locked in his suitcase. He showed the notebook to no one.

In August 1992 Salone testified before the grand jury. Between September and December 1992 appellants filed motions for discovery of exculpatory and impeachment information and Jencks Act material. They asked for, among other things, all such papers within the possession, custody, or control of the government, as well as any notes prepared by any government employee. The government did not turn over Salone's spiral notebook.[1] In December 1992, a few months before trial, Salone left South Carolina and destroyed the spiral notebook.

Appellants first learned about the spiral notebook at trial in late March 1993 during Harrison's cross-examination of Salone. Various appellants then took turns cross-examining Salone about the notebook (asking who knew about it, who knew he destroyed it, *et cetera* ). Because they had not received the notebook during discovery, appellants moved for a mistrial and, in the alternative, to strike Salone's testimony. The government took the position that it was as surprised as appellants were to learn of the notebook. The district court denied the motions, and appellants claim this was error.

■ In order to prevail on their *Giglio* and Jencks Act claims, appellants must show that the government had possession, or at least was aware, of Salone's spiral notebook. 18 U.S.C. § 3500(a) & (b) (Jencks Act, by its terms, applies only to statements "in the possession of the United States"); *United States v. Atkinson,* 512 F.2d 1235, 1239 (4th Cir.1975) (under *Giglio,* no duty to disclose when government did not know about or possess non-disclosed information); *see United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); *United States v. Goldberg,* 582 F.2d 483, 490 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). The government argues that it neither possessed nor was aware of the spiral notebook. Appellants say the government had custody or control over the notebook because, they allege, Agent Johnny Daniels was aware of it. Daniels, a narcotics agent with the Isle of Palms Police Department, was co-case agent in this investigation. He had primary responsibility for supervising Salone, and Salone reported to him almost every day (usually by telephone).

Our review of appellants' cross-examinations of Salone, as well as Agent Daniels' affidavit, leads us to conclude that Daniels was not aware of the spiral notebook. Salone testified that he told Daniels he wrote things down "every now and then" and showed Daniels some random notes he had jotted down on loose paper (*e.g.,* license plate numbers). But Salone did not show Daniels the spiral notebook nor tell Daniels he was

---

1. Salone was not a government employee.

keeping the detailed daily log in the spiral notebook. This was the gist of Salone's testimony on cross-examination, and it was confirmed by Daniels in his affidavit:

> During the investigation, I was not aware that Hezekiah Salone was keeping a personal notebook of his daily activities. He never informed me of this and I never gave him any instructions concerning whether or not to keep a notebook. I did believe that he may be writing down license plate numbers because he would call on occasion and give me license plate numbers for use in our investigation. On a few occasions, he gave me scrap pieces of paper with license plate numbers written on them.

Daniels said that when Salone called with updates "he never said he was reading from notes or a diary, and he never sounded like he was reading from notes or a diary." When Daniels debriefed Salone in person, Salone did "not have any notes or a diary with him." Finally, Daniels said he never asked Salone to record specific details, and Salone's reports were always of a general nature. Salone's trial testimony "was the first time that [Daniels] heard most of the specific details that [Salone] testified to."

In sum, we are confident from our review of the record that neither Agent Daniels nor any other government official was aware that Salone was keeping a detailed daily diary of his observations. It follows, then, that we cannot say that the government had actual or constructive possession of Salone's spiral notebook. Therefore, we must reject appellants' *Giglio* and Jencks Act claims.

### B.

■ Appellants say the government informants engaged in improper behavior during the course of the investigation (*e.g.*, theft and non-controlled drug buys). At trial appellants wanted to impeach the informants by demonstrating that their behavior was not condoned by, and indeed violated the official policy of, the government agency supervising them (the DEA). Along this line, appellants wished to impeach the testifying officials who worked with the informants (the main handlers did not testify). To these ends, appel-

lants tried to subpoena those portions of the DEA Agents Manual which dealt with the use of informants. According to appellants, they "sought to dispel the impression that anything goes with a witness in the war on drugs," Brief of Appellants at 25. The district court, without reviewing the manual *in camera*, quashed the subpoena on the ground that the manual was not relevant or material to guilt or innocence. Appellants say the district court abused its discretion.

The court may have abused its discretion, but any error was harmless. Through cross-examination appellants had the opportunity to put before the jury the informants' misbehavior. The jury could infer that much of this conduct was inappropriate and not condoned by the government agency responsible for their supervision. Appellants had the opportunity to cross-examine the informants and the government officials who testified with respect to whether they believed their conduct was improper; appellants did not need the DEA manual for that. Moreover, appellants had the opportunity to impeach the informants on other grounds. In short, even assuming *arguendo* that the manual was binding on informants (and not just agents), we believe the outcome of the trial was not affected by appellants' inability to show the jury that the informants' behavior may have been incongruent with official DEA policy.

### III. *Juror Bias*

■ Appellants next argue that the district court erred in refusing to excuse one juror. We review for abuse of discretion. *United States v. Grandison*, 783 F.2d 1152, 1155 (4th Cir.), *cert. denied*, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986).

During the initial *voir dire*, the juror at issue indicated (by his answers to questions) that he would be impartial, and without objection he was seated as a member of the jury. However, after the jury was selected but before the trial began, this juror called the clerk of the court and said he had transportation problems and "he thought he might favor the government." As a result of that statement, the district court later questioned

the juror in the presence of the government and defense lawyers. When asked to explain the basis for his comment to the clerk that he might favor the government, he said:

> Really, I've got three children, and they are all straight shooters, you know, they are not into drugs whatsoever. And I hear so much violence, et cetera, et cetera, and I myself don't think cocaine or other things are necessary. But that doesn't mean that they are guilty. I believe in certain things. They believe in certain things, or you know, whoever, doesn't mean I'm right all the time.

The court asked the juror a series of additional questions. Appellants asked the court to excuse the juror, but the court refused after concluding that he could be fair and impartial.

Appellants say the juror's statement that his kids were "straight" implied that he thought appellants were not. Moreover, appellants focus on the juror's statement that he believed drugs were not necessary whereas "they" may believe otherwise. The "they," appellants say, refers to them, indicating that the juror was predisposed to believing that they were involved with drugs. Because of these statements and the statement to the clerk, appellants contend that the district court abused its discretion in refusing to excuse the juror.

■ On the record before us, we cannot agree. First of all, during *voir dire* the juror indicated that he did not have any religious, philosophical or other views about drugs that would make it difficult for him to be impartial. Second, the juror indicated to the clerk that he "might" (not "would") favor the government. Third, when questioned by the court after he had called the clerk, the juror said (see quote above) that although he did not think drugs were necessary, that "doesn't mean that they are guilty." Finally, after being asked a series of additional questions by the court, the juror confirmed he could be fair and impartial and decide the case on the facts and law presented. *Compare United States v. Thompson,* 744 F.2d 1065 (4th Cir. 1984) (reversing district court's failure to excuse juror who, in response to court's question whether he could be impartial, respond-

ed "I am not sure, your Honor"). We conclude that the district court did not abuse its discretion in concluding that the juror would be impartial. *See United States v. Hines,* 943 F.2d 348, 353 (4th Cir.) (per curiam) (no abuse of discretion for failure to disqualify juror who held negative views of drugs and who, when asked by court if she could put aside her personal views about drug use, replied "I think so"), *cert. denied,* 502 U.S. 993, 112 S.Ct. 613, 116 L.Ed.2d 635 (1991).

## IV. *Evidentiary Issues*

### A.

■ Lisa Jackson challenges the hearsay testimony of informant Lester Williams. Williams testified at trial about certain statements made to him by Alfrieda Walker, who died before trial. Specifically, Williams testified that Walker told him she made trips to Florida with Jackson and other co-defendants to pick up cocaine, and on one occasion they picked up one-half kilogram of cocaine for appellant Harrison. Prior to admitting Williams's hearsay testimony, the district court allowed a *voir dire* examination of Williams. The court concluded that Walker's statements to Williams were admissible under Federal Rule of Evidence 801(d)(2)(E) (coconspirator's statements) after finding that Walker was a coconspirator and that her statements were made in furtherance of the conspiracy.

■ Rule 801(d)(2)(E) allows the admission of hearsay if the district court finds by a preponderance of the evidence (1) that there was a conspiracy involving the declarant and the party against whom the statement is offered and (2) that the declarant's statement was made during the course of and in furtherance of the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2789, 97 L.Ed.2d 144 (1987). We review these underlying factual questions for clear error. *United States v. Blevins,* 960 F.2d 1252, 1255 (4th Cir.1992).

As for the finding of a conspiracy, in addition to the hearsay, there was some independent evidence to support a finding that Lisa Jackson and decedent Walker were involved in the same conspiracy. This evidence came

from Williams. He testified that he purchased drugs from Walker, Jackson and co-defendants Gardenia Jackson (Lisa Jackson's sister), Peter Johnson (Lisa Jackson's husband) and Deatrice Brown. When Williams wanted drugs and could not find Walker, he would go to Brown or Gardenia or Lisa Jackson. He testified about a couple of occasions when he bought cocaine from Walker and Brown while they were accompanied by Lisa and Gardenia Jackson. And on several occasions he picked up drugs from Gardenia Jackson while she was accompanied by Lisa Jackson, Walker and Brown. The district court's finding of a conspiracy was not clearly erroneous.

With respect to whether Walker's statement was made in the course of and in furtherance of the conspiracy, Williams testified that Walker told him about drug runs to Florida when he (Williams) approached Walker for drugs. Specifically, sometimes when Williams approached Walker for drugs, she said she did not have any but might be going out of town to get some. It was in the context of one such conversation that Walker said she had plans to go with Lisa Jackson to Florida, where they would be picking up one-half kilogram of cocaine for Harrison. (Williams further testified that on those occasions when Walker went to Florida, he waited a few days for her to get back and then got crack from her. If he could not find her, he would get it from Lisa Jackson, Gardenia Jackson or Brown.) In light of this testimony, we cannot say the district court made a clearly erroneous finding that Walker's statement was made in furtherance of the conspiracy.

### B.

Appellants challenge the admission of certain tape recordings of drug transactions as well as the presentation to the jury of accompanying transcripts prepared by the government.

Appellants focus on four tapes that were admitted into evidence. In particular, appellants take issue with the government's identification, through the testimony of informants and government agents, of Harrison's voice on the tapes. *See* Fed.R.Evid. 901(b)(5) (al-

lowing for voice identification "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker"). Appellants argue that these tapes were not sufficiently authenticated, that the portions presented to the jury were without context, and that the accompanying transcripts did not accurately reflect the tapes.

■ We review for abuse of discretion the admission of a tape recording. *United States v. Clark,* 986 F.2d 65, 68 (4th Cir.1993). "Upon review, we will not find error unless the foundation for admission is clearly insufficient to insure the accuracy of the recording." *Id.* at 69 (quotations omitted). "We have consistently allowed district courts wide latitude in determining if a proponent of tape recordings had laid an adequate foundation from which the jury reasonably could have concluded that the recordings were authentic and, therefore, properly admitted." *United States v. Branch,* 970 F.2d 1368, 1372 (4th Cir.1992) ("[t]he jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims").

■ Here, the foundation was not clearly insufficient. Appellants do not seem to question that the tapes were authentic recordings of drug deals, but rather whether Harrison was correctly identified as a speaker on the tapes; they say the informants and agents who identified Harrison's voice were unreliable. But so long as there is a basis for the jury to resolve the authenticity question in favor of the party offering a tape recording, arguments on the reliability of identification go to the weight of the evidence, not its admissibility. *See id.* at 1371–72; *see also United States v. Kandiel,* 865 F.2d 967, 974 (8th Cir.1989) ("Any question concerning the credibility of the identifying witness simply goes to the weight the jury accords this evidence, not to its admissibility."); *United States v. Vega,* 860 F.2d 779, 788–90 (7th Cir.1988); *United States v. Cuesta,* 597 F.2d 903, 915 (5th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979). Appellants had the opportunity to cross-examine the government's identifying witnesses and

to argue to the jury that Harrison was not a party to the taped transactions.[2]

■ Next, appellants argue that the district court erred in permitting the jury to follow government-prepared transcripts while listening to the tapes. (The transcripts were not admitted as evidence.) "Whether to allow the use of transcripts to aid in the presentation of tape recorded evidence is within the district court's sound discretion." *United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir.1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985). For the following reasons, we conclude that the court did not abuse its discretion. First, appellants had the opportunity to explore through cross-examination any inaccuracies in the transcripts, including inaccuracies with respect to the identification of speakers on the tapes. *See Clark*, 986 F.2d at 69; *Collazo*, 732 F.2d at 1204. Second, the court repeatedly told appellants they could submit their own transcripts, but they apparently did not take advantage of that opportunity, perhaps suggesting that the transcripts were substantially accurate. *See United States v. Nixon*, 918 F.2d 895, 902 (11th Cir.1990). Finally, the court gave an appropriate limiting instruction, explaining: "The tapes in this matter constitute the evidence, and the transcript is only an aid. In the event of any discrepancy between the tape and the transcript, what you listen to on the tape will in every instance govern. The tape is the evidence, the transcript.... They're [sic] just for an aid." Trial Transcript, Afternoon of March 1, 1993, at 37. *See Collazo*, 732 F.2d at 1203 (cautionary instructions cured prejudice that might have resulted from discrepancies between tape and transcript).[3]

## V. *Sufficiency of the Evidence*

Appellants Lisa Jackson and Peter Johnson (wife and husband by common-law marriage) argue that the evidence was insufficient to convict them for the single, large conspiracy charged in Count One of the indictment.

■ When reviewing a sufficiency-of-the-evidence challenge, we view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and we ask whether "*any* rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The verdict must stand if there is substantive evidence to support it. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469.

■ As for the elements of a conspiracy, "the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." *United States v. Bell*, 954 F.2d 232, 236 (4th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 112, 126 L.Ed.2d 77 (1993). The government may prove these elements with circumstantial evidence.

With respect to the first element, a single conspiracy exists when "[t]he conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same product." *United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir.1995) (quotation omitted).

> Critically, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure; the requisite agreement to act in concert need not result in any such formal structure, ... [and may] result[ ] in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise....

*United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir.1993), *cert. denied*, —— U.S. ——,

---

**2.** We note that the district court held a pretrial hearing on the authenticity and quality of the tapes. The court listened to the tapes, heard testimony and made preliminary rulings on admissibility. The court sustained objections to the admissibility of some of the tapes.

**3.** With respect to their argument that the tapes were presented without context and generally lacked quality, appellants have shown us nothing to back up these assertions. We note that the district court told appellants that if the government played only a portion of a tape, appellants could play the remainder for the jury.

114 S.Ct. 1850, 128 L.Ed.2d 475 (1994) and — U.S. ——, 114 S.Ct. 2681, 129 L.Ed.2d 814 (1994). With respect to the participation element, "[i]t is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities." *Id.; United States v. Brooks,* 957 F.2d 1138, 1147 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992).

■■■■ The gist of Jackson's argument is that although the evidence may have shown that she was in a conspiracy in the Holly Hill area (it clearly did), a rational juror could not infer that she was in a conspiracy that included appellant Harrison and the others from Ridgeville. She cites to the testimony of informant Salone. He testified about two different rings, one operating primarily in Holly Hill and the other in Ridgeville. According to Salone, the Holly Hill ring included defendants Deatrice Brown, Samuel Brown, Germaine Robinson, Vincent Robinson, Travyuis Cokely, Lisa Jackson and Peter Johnson,[4] while the Ridgeville ring included defendants Darrol Harrison, Anthony Capers and Gregory Overton. Salone said the two rings were just friends.

However, Salone also testified that the Ridgeville group and the Holly Hill group got drugs for each other. He noted, for example, one occasion when Lisa Jackson (Holly Hill) got drugs from Harrison (Ridgeville). Moreover, Salone also testified that other Holly Hill defendants (with whom Jackson conspired) were involved with the Ridgeville group. Furthermore, informant Williams testified that decedent Alfrieda Walker told him that she was going to Florida with Lisa Jackson and other Holly Hill co-defendants and that they would be picking up one-half kilogram for Harrison, the putative leader of the Ridgeville group. *See supra* Issue IV.A.

Viewed in the light most favorable to the government, there was substantial evidence for a rational juror to infer beyond a reasonable doubt that there was a single conspiracy

and that Lisa Jackson participated in it. Even if "no formal structure could have been inferred, the interdependence of participants charged . . . in pursuing this ultimate illegal object, easily could be." *Banks,* 10 F.3d at 1054.

■■■■ As for the sufficiency of the evidence on Johnson's participation in the conspiracy, he says there was no testimony that he ever met appellant Harrison or any of Harrison's close friends. But the government need not prove that a defendant knew everyone in the conspiracy. Nor does the government have to prove that the defendant participated in all phases or knew all the details of the conspiracy. *Id.; Brooks,* 957 F.2d at 1147. There was plenty of evidence that Johnson sold drugs to several of the Holly Hill defendants. And there was substantial evidence from which the jury could infer that he sold drugs with his wife, Lisa Jackson, who, as we just concluded above, was linked by substantial evidence to Harrison and the large conspiracy. Therefore, we cannot say the evidence was insufficient to show Johnson's participation in that conspiracy.

### VI. *Sentencing*

At sentencing, the district court enhanced Capers' base offense level by three levels pursuant to U.S.S.G. § 3B1.1(b) after finding that he was a manager or supervisor in the conspiracy. U.S.S.G. § 3B1.1(b) says, "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase [base offense level] by 3 levels." Our court has held that, based on the plain meaning of the term "manager," the enhancement can apply not only when the defendant controls people but also when the defendant has "extensive management responsibilities over property, assets, or activities of the criminal organization." *United States v. Chambers,* 985 F.2d 1263, 1268 (4th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 107, 126 L.Ed.2d 73 (1993). The district court enhanced Capers' sentence

---

**4.** The evidence showed that Jackson and Johnson lived in Wagner, South Carolina, but sold drugs in Holly Hill.

on the basis of *Chambers,* finding that Capers had control over the collection of money and delivery of drugs.

Several months after Capers was sentenced but before he filed his brief on appeal, the Sentencing Commission amended the commentary to U.S.S.G. § 3B1.1 by adding a new Application Note 2. It says:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, Application Note 2 (effective Nov. 1, 1993). Had Capers been sentenced after the effective date of this amended commentary, the enhancement would not have been warranted. But this amendment became effective after Capers was sentenced, and he wants us to apply it retroactively. We must determine, then, whether the 1993 amendment to the commentary of U.S.S.G. § 3B1.1 warrants retroactive application.

■ Generally, subject to the limitations of the ex post facto clause, courts are to use "the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a); 18 U.S.C. § 3553(a)(4). But "Congress has granted the Commission the unusual explicit *power* to decide whether and to what extent its amendments reducing sentences will be given retroactive effect, 28 U.S.C. § 994(u). This power has been implemented in Guideline § 1B1.10, which sets forth the amendments that justify sentence reduction." *Braxton v. United States,* 500 U.S. 344, 348, 111 S.Ct. 1854, 1858, 114 L.Ed.2d 385 (1991). U.S.S.G. § 1B1.10 allows for consideration of a reduced sentence only if the amended range is the result of one of the amendments listed in that guideline. The 1993 amendment to the commentary of U.S.S.G. § 3B1.1 is not listed in U.S.S.G. § 1B1.10, and therefore the government maintains that we cannot give the amendment retroactive effect.

■ But the government overlooks an important point: courts can give retroactive effect to a clarifying (as opposed to substantive) amendment regardless of whether it is listed in U.S.S.G. § 1B1.10. *United States v. Deigert,* 916 F.2d 916, 917–18 (4th Cir.1990) (per curiam); *United States v. Fells,* 920 F.2d 1179, 1184 (4th Cir.1990), *cert. denied,* 501 U.S. 1219, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991). This rule applies when a sentencing court is faced with a presentencing clarifying amendment that postdates the particular edition of the Guidelines Manual used at sentencing. U.S.S.G. § 1B1.11(b)(2) ("[I]f a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes."); *see Deigert,* 916 F.2d at 917–18. The rule also applies when a reviewing court is confronted with a postsentencing clarifying amendment. *See United States v. Fant,* 974 F.2d 559, 564 (4th Cir. 1992); *United States v. Johnson,* 953 F.2d 110, 113 (4th Cir.1991); *Fells,* 920 F.2d at 1184.[5] "Such an amendment changes nothing concerning the legal effect of the guidelines, but merely clarifies what the Commission deems the guidelines to have already meant." *United States v. Smaw,* 22 F.3d 330, 333 (D.C.Cir.1994). "Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying

**5.** *Accord United States v. Caballero,* 936 F.2d 1292, 1299 n. 8 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992); *Isabel v. United States,* 980 F.2d 60, 62 (1st Cir.1992); *United States v. Colon,* 961 F.2d 41, 45 (2d Cir.1992); *United States v. Ofchinick,* 877 F.2d 251, 257 n. 9 (3d Cir.1989); *United States v. Anderson,* 5 F.3d 795, 801–02 (5th Cir. 1993), *cert. denied,* —— U.S.——, 114 S.Ct. 1118, 127 L.Ed.2d 428 (1994); *United States v. Okayfor,* 996 F.2d 116, 121 (6th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993); *United States v. Fiala,* 929 F.2d 285, 290 (7th Cir.1991); *United States v. Renfrew,* 957 F.2d 525, 527 (8th Cir.1992); *United States v. Madera–Gallegos,* 945 F.2d 264, 267 n. 2 (9th Cir.1991); *United States v. Blair,* 54 F.3d 639, 645 (10th Cir.1995); *United States v. Camacho,* 40 F.3d 349, 354 (11th Cir.1994). *See also Early v. United States,* 502 U.S. 920, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991) (White, J., dissenting from denial of certiorari).

revisions to the Guidelines conflicting judicial decisions might suggest." *Braxton*, 500 U.S. at 348, 111 S.Ct. at 1858; *see* U.S.C. § 994(*o*).

The specific issue before us, then, is whether the 1993 amendment to the commentary of U.S.S.G. § 3B1.1 represents a clarification, as opposed to a substantive change in the operation of the guideline. "[T]hese categories [are] unclear, and as is usually the case, there are factors supporting either side." *United States v. Prezioso,* 989 F.2d 52, 53 (1st Cir.1993).

The Commission said that the 1993 amendment "clarifies the operation of [U.S.S.G. § 3B1.1]. . . ." U.S.S.G., Appendix C, Amendment 500 (effective Nov. 1, 1993). The Commission's characterization of the amendment as clarifying "cannot be accepted as conclusive," however, because "that would enable the Commission to make substantive changes in the guise of 'clarification,'" *United States v. Guerrero,* 863 F.2d 245, 250 (2d Cir.1988) (reasoning adopted by our court in *Deigert, supra* ); *see United States v. Cianscewski,* 894 F.2d 74, 78 (3d Cir.1990) ("We do not suggest that the Sentencing Commission, by declaring that substantive changes are intended merely as clarifications, can amend the guidelines retroactively."). In determining whether we will accept the Commission's characterization of the amendment, we need to look to the amendment's purpose and effect.

The 1993 amendment did not alter the text of the guideline itself but rather amended the commentary by adding a new application note to explain what it means to be an organizer, leader, manager or supervisor. Prior to the amendment some circuits (including ours) had concluded that a defendant's control over property, assets or criminal activities could trigger U.S.S.G. § 3B1.1(b)'s enhancement. Other circuits, however, had concluded that the enhancement was warranted only when the defendant controlled one or more participants in the criminal endeavor. The 1993 amendment explains that an increased sentence may be warranted in either case, though an enhancement (as opposed to an upward departure) is the appropriate vehicle only for those defendants who controlled people. The Commission said it

adopted the amendment "to resolve a split among the courts of appeal." U.S.S.G., Appendix C, amendment 500 (effective Nov. 1, 1993). It gave a string cite to illustrate the circuit split, and *Chambers* was the only decision listed on one side of the conflict (a sign that the amendment was a response to *Chambers* ). *See United States v. Ronning,* 47 F.3d 710, 712 (5th Cir.1995) (commenting that the 1993 amendment was a response to *Chambers* ).

In light of this background, we conclude that the 1993 amendment to the commentary of U.S.S.G. § 3B1.1 is not a mere clarification because it works a substantive change in the operation of the guideline in this circuit. The amendment has the effect of changing the law in this circuit. Before the amendment, a defendant in this circuit could receive the enhancement without having exercised control over other persons; after the amendment, the defendant must have exercised control over other persons to warrant the enhancement. *See United States v. Reedy,* 30 F.3d 1038, 1039 (8th Cir.1994) (the court indicated that the 1993 amendment to U.S.S.G. § 3B1.1 (at issue here) was not a mere clarification, and therefore could not be applied retroactively, because it repudiated the Eighth Circuit's earlier interpretation of U.S.S.G. § 3B1.1, which reasoned along the lines of *Chambers* ).

Our decision is in accord with other circuit courts which have held that an amendment should be classified as substantive, not clarifying, when it cannot be reconciled with circuit precedent. For example, in *United States v. Saucedo,* 950 F.2d 1508 (10th Cir. 1991), *overruled on other grounds, Stinson v. United States,* —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), the Tenth Circuit declined to apply retroactively a 1990 amendment to the commentary of U.S.S.G. § 3B1.1, notwithstanding that the Commission had characterized the amendment as a clarification. *Id.* at 1512–16. The court said:

Courts frequently consider clarifying amendments to discern the Sentencing Commission's intent as to application of the pre-amendment guideline. However, when we are required to overrule precedent in this circuit in order to interpret the

guideline consistent with the amended commentary, we cannot agree with the Sentencing Commission that the amendment merely clarified the pre-existing guideline.... The Sentencing Commission's post hoc clarification of its intent does not invalidate our pre-amendment interpretation of the guideline. The November 1990 amendment is a substantive change to § 3B1.1 in this circuit....

950 F.2d at 1514–15 (citations omitted).[6] *See United States v. Mondaine*, 956 F.2d 939, 942 (10th Cir.1992) ("In *Saucedo*, we refused to accept the Commission's characterization of an amendment to the commentary as merely clarifying because we were required to overrule precedent construing the guideline in order to interpret it consistently with the amended commentary."). Citing *Saucedo*, the Ninth Circuit in *United States v. Smallwood*, 35 F.3d 414 (9th Cir.1994), "[r]espectfully disagree[d] with the Sentencing Commission's conclusion that [an] amendment [was] only clarifying and not substantive" because "[t]he amendment change[d] the substantive law and the meaning and effect of the guidelines in [that] circuit...." *Id.* at 418 n. 8 (ex post facto case). The First Circuit followed a similar path in *Prezioso*,

*supra.* There the court was faced with an amendment to the commentary of U.S.S.G. § 4A1.1(d), an amendment which was favorable to the defendant and which the Commission deemed a clarification. But the amendment was at odds with the First Circuit's earlier decision in *United States v. Gallego*, 905 F.2d 482 (1st Cir.1990), prompting the court in *Prezioso* to say:

> We must determine whether, in light of our circuit precedent to the contrary, we should apply the 1991 amendment retroactively to the 1990 version of the guidelines in this case.
>
> . . .
>
> [O]ur holding in *Gallego* weighs in favor of characterizing the amendment as a substantive change. Given that holding, the amendment alters the guideline as interpreted by the First Circuit.

989 F.2d at 53–54. In a similar vein, the Eighth Circuit has explained that it has "declined to consider a post-sentence commentary amendment ... when the amendment would have required [it] to overrule Eighth Circuit precedent." *United States v. Renfrew*, 957 F.2d 525, 527 n. 3 (8th Cir.1992) (citing cases). *See also Reedy, supra.*[7]

---

6. Unlike our case, where we must determine whether the defendant gets the benefit of an amendment that favors him, *Saucedo* involved a different twist. The amendment there was less favorable to the defendant than the court's pre-amendment interpretation of the guideline, and thus there was an ex post facto concern. *Saucedo* suggested in *dicta* that this might be a significant distinction for purposes of the clarifying/substantive inquiry. *See Saucedo*, 950 F.2d at 1514 n. 11 (distinguishing *United States v. Caballero*, 936 F.2d 1292 (D.C.Cir.1991), *cert. denied*, 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992), on the ground that the amendment there "benefitted rather than disadvantaged the defendant, thereby removing any ex post facto concern"). Nevertheless, *Saucedo* did hold that the amendment was a substantive change because it repudiated the Tenth Circuit's prior interpretation of the guideline. And, in any event, we think *Saucedo*'s suggested distinction is one without a difference. The effect of an amendment on the operation of a pre-existing guideline is what determines whether an amendment represents a clarification, not the effect on the defendant's sentence (the ex post facto inquiry).

7. *But see United States v. Joshua*, 976 F.2d 844, 856 (3d Cir.1992) (applying retroactively an

amendment that conflicted with that circuit's prior interpretation of guideline); *United States v. Fitzhugh*, 954 F.2d 253, 255 (5th Cir.1992) (same); *United States v. Thompson*, 944 F.2d 1331, 1347–48 (7th Cir.1991) (same), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992); *Caballero, supra* (same). We find these cases unpersuasive.

Of these cases, *Joshua* gave the most comprehensive treatment to the issue. It held:

> [W]e may consider a new commentary regarding an ambiguous guideline in determining how that guideline should be applied. We further hold that a panel may consider new commentary text where another panel of this court has already resolved the ambiguity and that a second panel is entitled to defer to the new commentary even when it mandates a result different from that of the prior panel.

*Joshua*, 976 F.2d at 855. The Third Circuit said its holding was "significantly influenced by what [it] underst[ood] to be the Commission's role in the statutory scheme," namely, to review and revise the guidelines. *Id.* at 854 (citing 28 U.S.C. § 994(*o*) and *Braxton, supra*). But while that role may justify a court's prospective application of guideline and commentary revisions that conflict with earlier judicial interpretations, it does not necessarily justify retrospective application of

We are aware that the Seventh Circuit recently held that the 1993 amendment to U.S.S.G. § 3B1.1 was a clarifying amendment and applied it retroactively, even after acknowledging that the amendment "nullified" the Seventh Circuit's earlier interpretation of the guideline. *United States v. Fones*, 51 F.3d 663, 669 (7th Cir.1995) ("[The amendment] effectively nullifies the law of the Seventh Circuit. Nonetheless, it must be viewed as a clarifying rather than substantive change to the application of § 3B1.1."). *Fones* based its conclusion on two points. First, the court noted that the amendment did not alter the language of the guideline. *Id.* Second, the court said that the amendment "is a reasonable interpretation of the plain language of § 3B1.1—that having control or authority over individuals is part of what it means to be a leader, organizer, supervisor, or manager." *Id.* We are not persuaded.

As for the first point, the fact that the 1993 amendment did not amend the text of the guideline is a red herring. Amendments to commentary can be substantive. Indeed, "[b]ecause the commentary and the guideline both are binding, . . . we must not be too quick to hold that an amendment to the commentary is merely a clarification." *United States v. Bertoli*, 40 F.3d 1384, 1405 (3rd Cir.1994). (Moreover, *Fones'* converse suggestion, that an amendment to a guideline necessarily is substantive, is at odds with *Deigert, supra*, where we held, in adopting the reasoning of a Second Circuit case, that amendments to both commentary and guideline text were clarifications.)

As for *Fones'* second point, that the amendment constitutes a reasonable interpretation of the "plain language" of the guideline, the problem is that our *Chambers* decision was based on the plain meaning of the term "manager" in U.S.S.G. § 3B1.1(b); *Chambers* did not say that the guideline was ambiguous. *See United States v. Ruiz–Batista*, 956 F.2d 351, 353 (1st Cir.) ("To clarify means to make clear, to free from ambiguity, and . . . if there was no ambiguity, and the plain, original meaning was as [defendant] contends, the Commission could not change that meaning retroactively by using a magic word, clarification."), *cert. denied*, —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992). It follows from *Chambers*, then, that the 1993 amendment to the commentary is contrary to the plain meaning of § 3B1.1(b). *See Mondaine*, 956 F.2d at 942 ("Given the plain meaning of the pre-amendment version . . . we conclude that the amendment makes a substantive change in the law rather than a clarification of pre-existing law."); *cf. Prezioso*, 989 F.2d at 54 ("any amendment that is inconsistent with the clear meaning [of the guideline it interprets] results in a substantive change, regardless of the Sentencing Commission's characterization"); *Joshua*, 976 F.2d at 854–55 (court should not give retroactive effect where "the text of the guideline will not support [the amendment's] interpretation"). Indeed, *Chambers'* plain meaning interpretation is vindicated to some extent by the 1993 amendment. By saying that an upward departure may be warranted in the case of a defendant who "exercised management responsibility over the property, assets, or activities of a criminal organization," the amendment confirms that one need not control people to be a manager.[8]

In sum, we hold that the 1993 amendment to the commentary of U.S.S.G. § 3B1.1 is a

those revisions. *Cf. Stinson*, —— U.S. at ——, 113 S.Ct. at 1920 (the fact that the amendment to commentary was binding did not necessarily mean that it should be given retroactive effect). Moreover, as discussed in the text following this note, we have before us an amendment that contravenes the plain meaning of the guideline, and therefore *Joshua*, with its focus on the resolution of ambiguities, arguably does not apply.

8. The Fifth Circuit, like the Seventh, has concluded that the 1993 amendment to the commentary of U.S.S.G. § 3B1.1 is a clarifying amendment. *United States v. Gross*, 26 F.3d 552, 555 (5th Cir.1994). The case is not persuasive, however. First, the court apparently found conclusive the Commission's characterization of the amendment as clarifying. Second, the court did not face our issue: whether the amendment's rule that a manager must control people was a mere clarification. Rather, the court held that the "amendment clarified that § 3B1.1 requires the participation of more than one culpable person," *id.*, a meaning that fairly could be drawn from the text and pre-existing commentary of U.S.S.G. § 3B1.1. Third, the Fifth Circuit did not indicate that the amendment nullified its earlier interpretation of the guideline.

substantive amendment. It effects a substantive change in the operation of U.S.S.G. § 3B1.1 in this circuit because its retroactive application would require us to scrap our earlier interpretation of that guideline. Indeed, the amendment was designed to have us do just that. And because, as noted above, the Commission did not list the amendment in U.S.S.G. § 1B1.10, we will not consider its retroactive application. *See generally United States v. Havener*, 905 F.2d 3 (1st Cir.1990) (Breyer, J.). Accordingly, we affirm Capers' sentence.[9]

### VII. *Remaining Issues*

We have reviewed carefully the remaining issues raised by appellants and find them to be without merit.

*AFFIRMED.*

---

9. Of course, our decision deals only with the retroactive application of the amendment. The amendment should be applied prospectively to a defendant sentenced on an edition of the Guidelines Manual that postdates the amendment. *See Prezioso,* 989 F.2d at 54 n. 1.