UNITED STATES of America, Appellee,

v.

Catalino COLLAZO, Appellant.

UNITED STATES of America, Appellee,

v.

Moises ALVAREZ, Appellant.

UNITED STATES of America, Appellee,

v.

David YUSTE, Appellant.

UNITED STATES of America, Appellee,

v.

Ismael LLANEZ–DIAZ, Appellant.

UNITED STATES of America, Appellee,

v.

Adolfo MIRABAL, Appellant.

UNITED STATES of America, Appellee,

v.

Francisco NUNEZ–VARELA, Appellant.

Nos. 82–5023(L) to 5026, 82–5028 and 82–5204.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1984.

Decided April 12, 1984.

Stanley J. Reed, Asst. Federal Public Defender, Jeff E. Messing, Richard Winelander, Baltimore, Md. (Fred Warren Bennett, Federal Public Defender, Harold Buchman, Leslie L. Gladstone, Stuart R. Blatt, William S. Little, R. Roland Brockmeyer, Baltimore, Md., on brief), for appellants.

Linda Chatman Thomsen, Asst. U.S. Atty., Washington, D.C. (J. Frederick Motz, U.S. Atty., David B. Irwin, Asst. U.S. Atty., Ty Cobb, Asst. U.S. Atty., Baltimore, Md., LCRD, Robert W. Ferguson, Presidential Drug Task Force Coast Guard Coordinator on brief), for appellee.

Before WINTER, Chief Judge, MURNA-GHAN and SPROUSE, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

In this multi-defendant drug prosecution, six defendants challenge their convictions of conspiracy to distribute and possess with intent to distribute a quantity in excess of 1000 pounds of marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(6), and possession with intent to distribute a quantity in excess of 1000 pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(6). They raise numerous points of error. We find merit, however, in only two. We reverse convictions of two of the defendants but affirm as to the others.

## I.

Following months of undercover work by investigators of the Drug Enforcement Administration, arrangements were made for two federal agents, Andrew Feraco and Mortimer Moriarty, to purchase some ten thousand pounds of marijuana in Baltimore on October 29, 1981. The marijuana was to be delivered at the Hyatt Regency Hotel in Baltimore on the morning of October 29 in two U-Haul trucks to be supplied by the agents.

Prior to the sale and particularly through the night of October 28–29, Feraco and Moriarty met with numerous persons at the Hyatt Regency and the Johns Hopkins Motor Inn in Baltimore and spoke to others by telephone. Many of these conversations were taped by means of concealed electronic equipment.

At 7:00 p.m., Agent Feraco went to the Johns Hopkins Sheraton Motor Inn and delivered keys to two U-Haul trucks, which had been rented and parked at a local shopping center, to Milton Mainwold and Joseph Laviola, key figures in the marijuana sale. At approximately 10:00 p.m., F.B.I. surveillance agents observed four men pick up one of the U-Haul trucks at the shopping center. The agents followed the truck to a farmhouse in the rural area of Bel Air, Maryland. The house was determined to be rented to defendant Catalino Collazo. It was kept under surveillance for the rest of the night by some eleven federal agents.

During negotiations that continued throughout the night, Agent Moriarty, at the suggestion of defendant Francisco Nunez-Varella, telephoned room 246 of the Johns Hopkins Sheraton Motor Inn and spoke with a man who identified himself as "Moises" concerning certain problems that had developed in the negotiations. Many of the co-defendants, including Moises Alvarez, were observed by a surveillance agent, stationed in room 242 at the Sheraton, in conversation with each other outside the block of rooms which they variously occupied. Likewise, defendant Mainwold explained to Agent Moriarty the next morning that it was Moises Alvarez who was a coordinator for the sale and with whom Moriarty had been speaking by telephone the night before.

At around 8:00 o'clock the next morning, the U-Haul truck was observed to leave the Bel Air house and proceed to Baltimore, followed by a Chevrolet and a Mercedes-Benz. The truck and escort cars stopped briefly at the Sheraton and then drove to the Hyatt Regency. The truck and the Chevrolet parked and the occupants of the two vehicles entered the hotel; the Mercedes-Benz circled the block three times before it parked out of sight of the other vehicles.

The key to the U-Haul truck was delivered to Agent Moriarty, who went out to inspect the truck's contents, some three thousand pounds of marijuana. He then returned to the room where those involved in the sale were waiting for him, accompanied by an arrest team of federal agents. Seven individuals were placed under arrest, including defendants Mirabal, Nunez-Varella, and Collazo. Two pistols were seized from those arrested. Defendants Llanez-Diaz and Alvarez were arrested a few minutes later in the Mercedes; Llanez-Diaz was seated in the driver's seat and was found to be armed with a .22 caliber pistol, while Alvarez was seated in the front passenger's seat unarmed.

Immediately after the Baltimore arrests and when the sweep failed to yield one major figure that agents expected to be involved in the transaction, the investigation supervisor authorized the federal agents surrounding the Bel Air house to enter it to search for the additional suspect. No one was found in the house, but the searching agents observed a substantial amount of marijuana, weapons, and cash in plain view. Later that morning at F.B.I. headquarters, defendant Collazo signed a written consent to a search of the house after F.B.I. agents told him that the house already had been entered and contraband found.

Eight co-defendants pleaded guilty before the commencement of trial. The six defendants who appeal to us then were tried jointly before a jury. All except defendant David Yuste were found guilty on both counts of the indictment; Yuste was found guilty only on the conspiracy count.

## II.

During the trial, the district judge allowed the jury to use transcripts prepared by government agents to assist them in following tape recordings admitted into evidence. The jury used the transcripts both as it listened to the tape recordings during the government's case and when, in the middle of deliberations, it requested an opportunity to return to the courtroom to rehear a portion of the tapes. Defendants contend that the district court committed reversible error in both instances. We, however, disagree.

It is a fact that defendants never stipulated as to the transcripts' accuracy and the district court made no attempt to verify that the transcripts correctly reflected the content of the tapes. However, several times during the course of the trial, the district court gave a cautionary instruction to the jury to the following effect:

> The transcripts, I again tell you, are not evidence but merely aids to follow the voices on the tape and you are bound by your own recollection of what comes off

that tape, not those transcripts. Do you understand that?

Had the parties stipulated to the accuracy of the transcripts or had the court itself reviewed them, their use by the jury would clearly have been unobjectionable. *See United States v. Slade,* 627 F.2d 293 (D.C. Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). In the present case, however, the defendants voiced a general objection to use of the transcripts that the district court overruled solely on grounds that the transcripts had been adequately authenticated by the testimony of the agents who prepared them. The issue presented by the case thus is whether defendants, on the strength simply of a general objection to transcripts, can place the district court in the position of either having itself to undertake the laborious process of verifying the accuracy of the transcripts or having to prevent the government from using transcripts at all to aid in the presentation of tape recorded evidence.

▮▮▮▮ Whether to allow the use of transcripts to aid in the presentation of tape recorded evidence is within the district court's sound discretion. *United States v. Long,* 651 F.2d 239, 243 (4 Cir.), *cert. denied,* 454 U.S. 896, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In the circumstances of this case, its decision to allow use of the disputed transcripts without itself reviewing them was not an abuse of discretion. As a result of the district court's cautionary instructions, the jury was made aware that the transcripts offered only the government's interpretations of what the tapes contained. The repeated cautionary instructions cured any prejudice that might have resulted from discrepancies between tape and transcript. *See United States v. Bryant,* 480 F.2d 785, 791 (2 Cir.1974) (judge cured whatever initial error may have been committed in allowing jury to see inaccurate transcript by his careful and emphatic instructions closely akin to those in this case). Additionally, the record indicates that substantial support for the relative accuracy of the transcripts was developed by the government. Agents Moriarty and Feraco, one or the other of whom was

present during all of the recorded conversations, testified that they prepared the transcripts and that the transcripts were accurate. Finally, defendants were free to make specific objections to inaccuracies in the transcripts during the testimony in which the tape recordings and transcripts were utilized. Likewise, they were free to challenge the general techniques used in preparing the transcripts and the federal agents' personal knowledge in the context of cross-examination. *See United States v. Hall,* 342 F.2d 849, 853 (4 Cir.1965); *United States v. Onori,* 535 F.2d 938 (5 Cir. 1976). That defendants apparently chose to make few such challenges suggests either that the transcripts were substantially accurate or that defendants waived specific opportunities to challenge the transcripts' veracity.

■ Defendants argue further that even if use of the transcripts during the presentation of evidence was proper, the jury should not have been allowed to use them when it returned from deliberations to hear the tapes replayed. The point is without merit. The jury did not use the transcripts as "substitute evidence" in deliberations. Rather, as in the trial, the transcripts were used only in conjunction with the relevant tape recordings.

### III.

■ Defendant Collazo contends that the district court erred in refusing to suppress evidence discovered in the warrantless search of his home at Bel Air. We agree, and find that, at the least, evidence discovered in the search of the house prior to Collazo's consent must be suppressed as to Collazo. As to evidence seized in the consent search, we find the record before us inadequate to determine whether Collazo's consent was so tainted by the original illegal search as to make the subsequent

search pursuant to consent an impermissible fruit of the first entry.* We accordingly remand for further evidentiary development and determination of this issue.

In *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court held that warrantless entries to effect an arrest of a third person are unreasonable absent exigent circumstances or consent. The government claims that such exigent circumstances existed here, suggesting that in light of the recent arrests and quickly spreading publicity, the missing suspect might have attempted flight, that any effort on his part to escape from the house would have endangered others, and that he might have attempted to destroy evidence.

■ We think that the government's argument is unconvincing. There had been ample opportunity to obtain a warrant; the surveillance of the house had been going on since midnight and there almost certainly had been sufficient probable cause to obtain a search warrant at any time during the surveillance. The available government manpower at the house was sufficient to prevent flight from the house, and entering the house created a situation of danger at least comparable to that which might have been presented by a fleeing suspect. Finally, if there was concern regarding the destruction of evidence in the immediate aftermath of the arrests, that easily could have been cured by obtaining a warrant to search the house for evidence prior to the Baltimore arrests. The government will not be allowed to plead its own lack of preparation to create an exigency justifying warrantless entry. *See, e.g., Niro v. United States,* 388 F.2d 535 (1 Cir.1968).

■ Of course, Collazo, as lessee of the Bel Air house, alone has standing to challenge the admission of the evidence seized

---

* The only evidence on the subject, the testimony of the agent who obtained the consent to search, suggests that Collazo's consent did not depend on the information that agents had already entered the house and found contraband. Nonetheless, it seems that where government agents inform a defendant that they have entered his

house and are in control thereof and that they have found contraband, there is a strong possibility that the consent is a fruit of the original illegal entry. *See Holloway v. Wolff,* 482 F.2d 110 (8 Cir.1973); 2 La Fave, *Search and Seizure,* § 8.2(d). The issue is one of fact and should be the subject of full evidentiary development.

in the search. No other defendant has advanced a claim to even an arguable expectation of privacy in the house. *See United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (standing to challenge applies only to those whose own fourth amendment rights have been violated—legitimate expectation of privacy required); *United States v. Tortorello,* 533 F.2d 809 (2 Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976).

### IV.

Defendant Llanez-Diaz contends that there was insufficient evidence, both as to the conspiracy count and as to the substantive possession count, to sustain his conviction. We agree only as to the substantive count.

■ To justify a conviction on the substantive possession count under 21 U.S.C. §§ 841(a)(1) and 841(b)(6), the government was required to present evidence that Llanez-Diaz knowingly possessed the marijuana—that is, that he knowingly exercised or had the power to exercise dominion and control, either actual or constructive and either individually or jointly with others, over it. *See United States v. Laughman,* 618 F.2d 1067, 1076–77 (4 Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980); *United States v. Stephenson,* 474 F.2d 1353, 1355 (5 Cir.1973).

■ As we must, we have reviewed the evidence at trial in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). At best, the government's evidence tended to show that Llanez-Diaz was armed and that he was present in an automobile which escorted the U-Haul truck containing marijuana, and that the other occupant of the auto was Moises Alvarez, a key conspiracy figure. However, Llanez-Diaz was out of view of the U-Haul truck while the drug transaction was occurring. No surveillance agent placed him in the Mercedes while it was escorting the truck through Baltimore, a fact that is significant because the Mercedes stopped at the Sheraton before reaching the Hyatt, and thus

may have discharged and picked up passengers at the Sheraton. Llanez-Diaz may also have been the subject of a photograph taken by federal agents of a group of men at Collazo's house.

All of this, to our minds, offers no convincing reason to believe that Llanez-Diaz knew of the presence of the marijuana or exerted any dominion or control, actual or constructive, sufficient to indicate possession with intent to distribute. The situation here is different from the one with which we dealt in *Laughman, supra,* where the conviction of the skipper of a sailboat for possession of marijuana with intent to distribute was upheld. There, a great deal of drug-related activity (moving packages assumed to be marijuana around the boat) had been observed, which in turn supported the inference that the skipper must have been aware of and participated in the delivery. No such evidence exists here. In the present case the evidence is entirely consistent with the theory that Llanez-Diaz was brought along merely as a hired gun and was not made aware of what was taking place or accorded any role other than that of armed chauffeur to Moises Alvarez.

■ We reject, however, the argument of Llanez-Diaz that there was insufficient evidence to sustain his conviction under 21 U.S.C. §§ 846 and 841(b)(6) for conspiracy to possess marijuana with intent to distribute. To sustain the conspiracy conviction, there need only be a showing that defendant knew of the conspiracy's purpose and some action indicating his participation. *Laughman, supra,* 618 F.2d at 1075. These elements can be shown by circumstantial evidence such as his relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy. In the circumstances of this case, the jury could have inferred that Llanez-Diaz was party to the ongoing purposes of the conspiracy to distribute large quantities of marijuana, even if the evidence was not clear on the exact nature of his participa-

tion in the Baltimore transaction. *Cf. United States v. McGuire,* 608 F.2d 1028, 1034 (5 Cir.), *cert. denied,* 446 U.S. 910, 100 S.Ct. 1838, 64 L.Ed.2d 262 (1980) (conspiracy conviction of defendant who drove principal in drug transaction to hotel where transaction took place and then waited outside could be sustained even though there was insufficient evidence to sustain possession conviction).

## V.

Defendants assert other points of alleged error regarding evidentiary rulings of the district court, that it erred in admitting Agent Moriarty's testimony regarding his telephone conversation with the man identifying himself as "Moises" and in allowing the government to argue that the man was defendant Alvarez, and in allowing the government to introduce handguns seized from defendants and the Bel Air house into evidence. Exception is also taken to the refusal of the district court to give a multiple conspiracy instruction. We find these additional contentions without merit.

■ Agent Moriarty's testimony regarding the telephone conversation did not reach the question of whether the man with whom he spoke on the telephone actually was Moises Alvarez; Moriarty merely reported the statements of the speaker, which were admissible under Fed.R.Evid. 801(d)(2) as the admission of a party and as the statement of a co-conspirator. The government's argument that the speaker was Alvarez likewise was proper; there was ample evidence in the record to support such an inference.

■ The admission of handguns into evidence in drug cases has been consistently upheld as relevant to the issues raised by such cases. *See, e.g., United States v. Picklesimer,* 585 F.2d 1199, 1204 (3 Cir. 1978); *United States v. Pentado,* 463 F.2d 355, 360 (5 Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). We see no considerations peculiar to this case that would cause us to depart from the general rule.

■ Finally, no multiple conspiracy instruction was required. The case involved a single sale of marijuana. in which all defendants were involved. There was indication in the evidence of prior negotiations and a prior aborted sale of marijuana in which all the defendants were not shown to have been involved. The essence of the conspiracy charged, however, was to deliver to agents Moriarty and Feraco a large quantity of marijuana, and that eventually was consummated in Baltimore with the participation of all of the defendants.

Alvarez contends additionally that there was insufficient evidence to support his conviction. His argument is predicated on his contention that the contents of the phone conversation between Agent Moriarty and "Moises" was not properly admissible. As we have found admission of evidence concerning the conversation to have been proper, Alvarez's argument must fail. There was ample evidence from which the jury could have inferred that he played a central role in the transaction.

## VI.

As to defendant Collazo, his convictions are reversed and the case is remanded for further proceedings not inconsistent with this opinion. As to defendant Llanez-Diaz, his conviction for conspiracy is affirmed, but his conviction for possession of marijuana with intent to distribute is reversed. We direct the district court to enter a judgment of acquittal for defendant Llanez-Diaz as to count two, possession with intent to distribute. In all respects, the judgments against the other four defendants are affirmed.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.