**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Craig Lawrence THOMAS,
Defendant–Appellant.**

**No. 91–5387.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1991.

Decided Jan. 28, 1992.

Denise Benvenga, Federal Public Defender's Office, Baltimore, Md., argued (Fred Warren Bennett, Federal Public Defender, Shirley M. Watts, Asst. Federal Public Defender, on brief), for defendant-appellant.

Raymond Allen Bonner, Asst. U.S. Atty., Baltimore, Md., argued (Richard D. Bennett, U.S. Atty., Stephen S. Zimmerman, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, SPROUSE, Circuit Judge, and MERHIGE, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

A jury convicted Craig Lawrence Thomas of robbing a Sovran Bank branch office in Baltimore. On appeal, Thomas contends that the district court erred in denying his Motion to Suppress Evidence seized from his hotel room. Agreeing with Thomas that the inevitable discovery exception does not apply to these facts and that his consent to search was invalid, we reverse.

## I.

At 2:00 a.m. on June 19, 1990, Thomas and a friend, Lawrence Henry, checked into the Hotel Belvedere in Baltimore. A third man actually registered for the room, because neither Thomas nor Henry had any identification. Thomas pulled a wad of cash larger than a baseball from his pocket and paid for the week in advance, peeling seven brand new hundred dollar bills from the wad. Thomas also requested no maid service for the week and tipped the bellhop who carried his bags $60. Later that morning, a front desk clerk saw Henry carrying a stack of newspapers into the hotel. These facts led the front desk Office Manager, Jeffrey Sterling, to suspect Thomas and Henry were going to deal drugs from their hotel room. Sterling knew of a prior incident of drug trafficking at the hotel, which is located in downtown Baltimore.

Sterling called the Baltimore City Police Department (BCPD). Two BCPD officers came to the hotel and spoke with Sterling. Sterling gave them a list of approximately 15 phone numbers dialed from Room 416, Thomas and Henry's room. The officers returned to police headquarters and found that a number of the calls were to apartment complexes. Thinking that Thomas and Henry were drug dealers who were about to change their locale, the BCPD officers returned to the hotel without getting a search warrant.

Along with a hotel security officer, three BCPD officers went to Room 416. They knocked, called out "hotel security," and waited. Loud music was playing in the room, and no one answered. The hotel passkey did not work, and the officers had to obtain another key from a hotel maid. Finally, they opened the door. The officers searched Room 416, which consisted of a living room, a bedroom, and a bathroom. The rooms were unoccupied. In the bathroom, instead of drugs, the BCPD found a bag containing thousands of dollars of cash in Sovran Bank wrappers. The government concedes that this first search of Room 416 was illegal, as no exception to the search warrant requirement applied.

After learning that a Sovran Bank branch had been robbed the previous day, the BCPD requested Federal Bureau of Investigation (FBI) assistance and began surveillance of Room 416 from Room 421 across the hall. Next, Henry and his uncle, Lawrence Phifer, entered Room 416 and stayed for about 10 minutes. As they left, the BCPD stopped and handcuffed them. FBI agents then arrived on the scene and took Henry and Phifer into Room 421, where they questioned Henry.

Henry's testimony about what happened next in Room 421 conflicted with the FBI agents' accounts. Henry claimed he was questioned for about 45 minutes, kept in handcuffs for much of the time, and threatened with a jail term of 25 years. The agents denied using threats and handcuffs and stated that Henry quickly became eager to exculpate himself. On one point there was agreement: The FBI agents confronted Henry with the fact that they had found money in Room 416. Henry said it belonged to Thomas. Then Henry signed a consent to search form, giving the agents his consent to search Room 416. During the second search of Room 416, Henry identified a blue bag as belonging to Thomas. The agents did not search the bag. Henry also called Thomas to find out when he would return.

Thomas then returned to the hotel and began to enter Room 416. Seven FBI agents immediately emerged from inside Room 416, arrested Thomas, handcuffed him, and took him into the living room. At first, Thomas was belligerent. He asked about Henry, who was in the bedroom with his uncle, both of them handcuffed. Thomas became more cooperative, signed a form waiving his *Miranda* rights, and then signed a form giving his consent to search the room. In Thomas' blue bag, FBI agents found clothes and tennis shoes matching the description of the robber given by the two bank employees who were robbed the day before.

Before his trial for armed robbery, Thomas filed a Motion to Suppress Evidence seized from Room 416 of the Hotel Belvedere. The district court conducted a motions hearing, heard an argument on the motion, ordered an additional argument, and considered supplemental memoranda. The court then denied Thomas' Motion to Suppress, applying the inevitable discovery exception to the exclusionary rule. At trial, on September 28, 1990, a jury convicted Thomas of bank robbery, armed bank robbery, and use of a firearm during a crime of violence.

## II.

Thomas challenges the district court's decision to admit evidence under the inevitable discovery exception, requiring this court to consider whether the district court properly applied the exception to the facts of this case. The Supreme Court first recognized the inevitable discovery rule in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Nix,* a detective violated a defendant's right to counsel when he persuaded the defendant to reveal the location of the body of a girl he had murdered. However, because an intense, meticulously planned search was underway for the girl's body, with search teams just hours from finding it, the Court agreed that the body would inevitably have been discovered. Therefore, the rationale of the exclusionary rule, which is the deterrence of police misconduct, did not clearly apply. The girl's body was admissible as evidence, although the suspect's statement was not. The Court held that evidence unlawfully obtained is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509. This court discussed the rationale behind the inevitable discovery rule in *United States v. Whitehorn,* 813 F.2d 646 (4th Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988). In *Whitehorn,* the court stated:

> [T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible.

*Id.* at 650 n. 4. The statement in *Whitehorn* is sensible; otherwise, if the illegal first search did taint the second search, the prosecution would profit from its own wrongdoing.

To argue the evidence in Room 416 inevitably would have been discovered, the government has relied on a string of conjecture: (1) no illegal entry, (2) surveillance from across the hall, (3) stopping of Henry for questioning, (4) Henry's implication of Thomas and consent to search, and (5) Thomas' consent to search. The govern-

ment's chain of inevitability has at least two broken links. First, there *was* an illegal entry. The initial step in the government's theory is to say, "If we hadn't done it wrong, we would have done it right." It is an inescapable fact that BCPD officers searched first and set up surveillance later. That suggests the second flaw, Henry's implication of Thomas and consent to search. Henry allegedly became cooperative only after the FBI questioned him about the money found in Room 416. If instead the BCPD, suspecting drug dealing, had stopped Henry for questioning, there is no reason to believe Henry would have connected Thomas to a bank robbery or given consent to search. In short, unlike *Whitehorn*, the invalid first search of Room 416 tainted what followed.

■ Alternatively, the government argues that the hotel staff's own investigation would have inevitably turned up the evidence in Room 416:

It would defy logic—the underpinning of the inevitable discovery doctrine—to think that the hotel personnel involved would have idly stood by, given the hotel's practices and policies and Sterling's suspicions of drug trafficking, had the police not returned to the hotel and not investigated Room 416.

Appellee Brief at 27. In this argument, the government attempts to satisfy one part of the inevitable discovery test in *United States v. Cherry*, 759 F.2d 1196 (5th Cir. 1985), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). The *Cherry* court stated that, before applying inevitable discovery:

[T]he prosecution [must] demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation.

*Id.* at 1204. The Eleventh Circuit has also adopted this three-part inevitable discovery test. *United States v. Hernandez–Cano*, 808 F.2d 779, 784 (11th Cir.), *cert. denied*,

482 U.S. 918, 107 S.Ct. 3194, 96 L.Ed.2d 682 (1987). Here, the government argues the hotel was pursuing an "alternate line of investigation." However, the government's argument rests on pure speculation about what would have happened had the police for some reason chosen not to respond. As the government's brief indicates, the facts only suggest the hotel would have pursued an alternate investigation if the BCPD had dropped its investigation. At the time of the illegal search of Room 416, the hotel had turned to the BCPD. The hotel's investigation was not separate but rather had merged with BCPD's investigation.

■ While it cannot be said that the hotel was pursuing an alternate investigation, this court has not previously considered whether the inevitable discovery exception requires one, and our previous decisions such as *Whitehorn* shed no light on the question. The Supreme Court majority in *Nix* did not require an alternate line of investigation, although a concurring Justice and two dissenting Justices stated the inevitable discovery exception should have that prerequisite. Instead of imposing such a blanket requirement, this court believes the most sensible examination of inevitable discovery is *United States v. Boatwright*, 822 F.2d 862 (9th Cir.1987). In that case, the Ninth Circuit held that the inevitable discovery exception does not require an alternate line of investigation. The *Boatwright* court reasoned that a situation other than a second investigation might make discovery inevitable. *Id.* at 864. The court then discussed what is needed at a minimum before the exception applies:

The facts of this case do not justify a comprehensive definition of inevitable discovery. The doctrine is best developed on a case by case basis. We do discern, however, an element that should be shown in most, if not every, case to which the doctrine pertains. Absent some overriding considerations not now apparent to us, the doctrine requires the fact or likelihood that makes discovery inevitable arise from circumstances other than those disclosed by the illegal search itself.

*Id.* at 864–65. We agree that the fact making discovery inevitable must "arise from circumstances other than those disclosed by the illegal search itself." That test is necessary to prevent the inevitable discovery exception from swallowing the exclusionary rule. The government has not satisfied that test, for the bank money found in the illegal search changed the whole nature of the investigation that followed. Only "the illegal search itself" led to the discovery of the stolen bank money.

## III.

■ Alternatively, the government argues that either Henry or Thomas gave valid consent to search Room 416 and that their consent cured the taint of the earlier illegal search. However, this court has recognized that "where government agents inform a defendant that they have entered his house and are in control thereof and that they have found contraband, there is a strong possibility that the consent is a fruit of the original illegal entry." *United States v. Collazo*, 732 F.2d 1200, 1204 n.* (4th Cir.1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985). While not reaching the issue of Henry's consent, the district court cited *Collazo* and stated it likely would have found Henry's knowledge that the FBI had found money taken from his room was an "operative factor" in his giving consent. Joint Appendix at 328–29.

The government attempts to distinguish *Collazo* in two ways. First, the government urges this court to apply *Collazo* only to defendants and not to third parties like Henry. That attempt to limit *Collazo* is unpersuasive. Henry signed the consent to search form and became cooperative only after he was handcuffed, moved about the hotel's fourth floor, and confronted with the stolen bank money found in his hotel room. The FBI did not treat him as an innocent third party. Next, the government interprets *Collazo* as establishing a multi-factor test. Under that theory, the government argues, "Mr. Henry's eagerness to exculpate himself rather than his knowledge that the police had been in the room was the dominant factor in driving Mr. Henry's decision." Appellee Brief at

39. This attempt to avoid *Collazo* is wordplay without merit. *Collazo* does not purport to set up a multifactor test. Even if it were so construed, the government has identified but one factor. Henry's "eagerness to exculpate himself" was a *result* of "his knowledge that the police had been in the room." Those are not two different factors but are instead cause and effect. In sum, it is apparent that Henry's consent was "fruit of the original illegal entry."

■ Finally, the government argues that Thomas' consent to search was valid. The district court agreed, distinguishing *Collazo* because "no credible evidence suggests that Thomas was told by the FBI that they had been in the room." Joint Appendix at 329. That observation ignores the facts of Thomas' arrest. As Thomas put his key in the door to Room 416, seven FBI agents opened the door from the inside, arrested Thomas, and brought him back inside the living room with them. Then, with FBI agents all about and two of his friends handcuffed in the bedroom, Thomas consented to a search. Thus, there was no need for Thomas to be told that the FBI had been in the room, because it was obvious they had been. Indeed, they were still in the room.

Therefore, we hold that the district court misapplied *Collazo* and that *Collazo* requires a finding that Thomas' consent, like Henry's, was "fruit of the original illegal entry." Because neither inevitable discovery nor consent to search applies, the district court's denial of the Motion to Suppress Evidence seized from Room 416 was erroneous. As that evidence comprised most of the government's case against Thomas, this court must overturn Thomas' conviction.

In his briefs to this court, Thomas also challenged three evidentiary rulings and a sentence enhancement. Because we have found it necessary to reverse Thomas' conviction, we do not reach those additional issues.

REVERSED AND REMANDED.