UNITED STATES of America, Plaintiff,

v.

Angel **RODRIGUEZ–CABRERA**,
Defendant.

No. Cr. 98–268(JAF).

United States District Court,
D. Puerto Rico.

Jan. 25, 1999.

---

Luis I. Santiago–Gonzalez, San Juan, PR, Daniel F. Lopez–Romo, Hato Rey, PR, Juan A. Pedrosa–Trapaga, San Juan, PR, for Angel E. Rodriguez–Cabrera, defendant.

---

### OPINION AND ORDER

FUSTE, District Judge.

### I.

### Factual Background

This is a criminal prosecution resulting from the indictment of Angel Rodríguez–Cabrera, also known as "Buzo", a prominent political and community leader and mayor of the Toa Alta municipality, charging him with conspiracy to commit corrupt solicitation, substantive corrupt solicitation, and extortion, in violation of 18 U.S.C. §§ 371, 666(a)(1)(B), 1951(a), and 2. The events surrounding the indictment stem from the disaster relief funds allocated to Puerto Rico by the Federal Emergency Management Agency ("FEMA") following Hurricane Georges, which devastated the island on September 21 and 22, 1998.

On Tuesday, November 24, 1998, an FBI cooperating witness ("CW") met with José Orlando Figueroa in a hotel room at the San Juan Marriott Hotel, in Condado, Puerto Rico, to exchange money as part of the charged extortion scheme. Figueroa entered the CW's hotel room, counted $20,000 in cash, commented on several documents which needed to be changed for purposes of the scheme, and informed the CW that he would obtain the necessary information to alter the documents. The CW asked Figueroa if he was taking the money to "Buzo", and Figueroa replied that he would take it to "Toa Alta." FBI agents, including Special Agent John A. Johnson, monitored this meeting through a television monitor. There is also an audiotape of that meeting.

After the meeting, Figueroa drove towards Bayamón, and an FBI surveillance team followed him. Eventually, Figueroa arrived in the municipality of Toa Alta and exited his vehicle near the municipality's City Hall building. The surveillance team at this point consisted of a number of agents following Figueroa, some of whom randomly took positions around the town square near the location of the municipal building, expecting an immediate arrest of Figueroa and Rodríguez–Cabrera.

On this particular day, there was a crowd of approximately one-hundred and fifty people gathered in the town square in front of City Hall as a result of a Thanksgiving festivity organized by the municipal authorities. Nevertheless, the surveillance team was able to see Figueroa exit his vehicle, open the trunk of his car, remove what appeared to be the money bag, and enter City Hall. At that point, the CW, in the company of FBI Special Agent Ricardo Rodríguez, telephoned Figueroa to verify that Figueroa had, in fact, given Defendant Rodríguez–Cabrera the money. This conversation was also tape recorded. During this conversation, the CW asks Figueroa if everything is fine and if Buzo "is happy." Figueroa responds that everything is fine, assures him that Buzo is happy, and then asks the CW if he would like to speak to Buzo. At this point, Rodríguez–Cabrera takes the phone. The CW asks him if he is happy and Rodríguez–Cabrera answers that he is, but that he will be happier once Candela is paid.

Figueroa left the municipal building, opened the trunk of his car to place an object in it, and prepared to drive away. At this point, an FBI agent arrested Figueroa. Special Agent Johnson further testified that a man later identified as Héctor Muñoz Camacho, Defendant's chauffeur, observed Figueroa's arrest and went to Rodríguez–Cabrera's office to inform him that Figueroa (the man with whom he had just met), had just been

arrested. Muñoz Camacho testified and admitted his role in informing Rodríguez–Cabrera of Figueroa's arrest.

The agents, clad in FBI raid jackets, followed Muñoz Camacho, entered the municipal building, and proceeded towards Rodríguez–Cabrera's office. Special Agent Johnson observed several people in the small reception area outside of the mayor's office. The court finds that one of the individuals was Muñoz Camacho, who had just informed Rodríguez–Cabrera of Figueroa's arrest. Special Agent Johnson then entered Rodríguez–Cabrera's office and identified himself. Special Agent Johnson advised Rodríguez–Cabrera that he was under arrest.

Special Agent Johnson testified that next Rodríguez–Cabrera asked something to the effect of "what is this about?" Special Agent Johnson replied that it was "about the money," and Rodríguez–Cabrera nodded. Special Agent Johnson stated that he inferred this nod to be Rodríguez–Cabrera's affirmation that he understood the significance of Johnson's reference to the money. Special Agent Johnson also states that at the same time, the agents asked Rodríguez–Cabrera to get up from behind his desk and stand facing the wall, with his arms up against it so that an agent could frisk him for weapons. After the agents conducted the pat-down and confirmed that Rodríguez–Cabrera did not have any weapon, Special Agent Johnson stated that he asked Rodríguez–Cabrera, "Where is the money?" Rodríguez–Cabrera then pointed to the middle drawer of his desk. Special Agent Johnson testified that he then asked for Rodríguez–Cabrera's consent to Johnson's opening the drawer and removing the money. According to Special Agent Johnson, Rodríguez–Cabrera replied that "there is no problem," and then opened the drawer himself, pulled out an envelope that contained the money, and handed the envelope to Special Agent Johnson.

After Special Agent Johnson recovered the money, he handcuffed Rodríguez–Cabrera and accompanied him out of the building. While preparing to leave, Muñoz Camacho and other staff members were banging on the walls in the reception area, screaming that the agents not remove Defendant in handcuffs. Special Agent Johnson testified that as the agents approached the exit of the building, they heard shouts from the crowd outside demanding that the agents not take the mayor away. At no time during this exchange did any agent advise Rodríguez–Cabrera of his *Miranda* rights. Special Agent Johnson testified that due to the unexpected high number of people in the City Hall building and in the town's city square, he wanted to conclude that part of the operation as soon as possible and take the arrestees away swiftly. Rodríguez–Cabrera was later "mirandized" upon arrival at the Federal Building in Hato Rey, Puerto Rico.

Before us is the question of whether we should suppress (1) Defendant's nod; (2) Defendant's pointing to the desk in response to Special Agent Johnson's question, "Where is the money?"; and (3) the money found in the desk.

## II.

### Admissibility of Evidence in Light of the Failure to Give Miranda Warnings

In light of the evidence presented, we find that Rodríguez–Cabrera was in custody once the agents entered his office and announced that he was under arrest.

### A. *The Nod*

When the agents entered Defendant's office, Rodríguez–Cabrera asked "What is this about?" Special Agent Johnson answered "It's about the money," and Rodríguez–Cabrera nodded in response. While acknowledging that at this point in time Rodríguez–Cabrera had not been given the *Miranda* warnings, we do not analyze the nod and its implications in terms of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because we find it unclear whether Special Agent Johnson's statement "It's about the money" was actually an interrogation whose purpose was to elicit an incriminating response, thus triggering the *Miranda* protections. *See United States v. Ventura*, 85 F.3d 708, 712 (1st Cir.1996) (stating "To find custodial interrogation, the court must first examine all the circum-

stances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was 1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and 2) express questioning or its functional equivalent."); *see also Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (stating that *"Miranda* warnings are required whenever a person in custody is subjected to either express questioning or to any words or actions on the part of the police reasonably likely to elicit an incriminating response from the suspect"). Because it is debatable whether Special Agent Johnson's answer to Defendant's question can reasonably be considered an interrogation within the meaning of *Miranda,* we will not base a suppression of the nod on this ground.

However, we do suppress the nod on the basis that its meaning is entirely too ambiguous to be admitted into evidence. While Special Agent Johnson understood the nod to mean that Rodríguez–Cabrera had knowledge of the extortion money to which he referred, this is Johnson's subjective interpretation of the nod. There are many equally plausible explanations for Rodríguez–Cabrera's nod. Rodríguez–Cabrera could have meant the nod to communicate that he would cooperate during his arrest; that he acknowledged the agents' presence; or merely that he heard what Special Agent Johnson had said in response to Rodríguez–Cabrera's question, "what is this about?" Simply put, the meaning of the nod is ambiguous and is not sufficiently reliable to be admitted into evidence as a statement by Defendant. There is no question that the prejudice that would result from admission of the nod substantially outweighs probative value. Fed. R.Evid. 102, 104(a), 403. *United States v. Wright,* 799 F.2d 423, 425 (8th Cir.1986) (upholding the exclusion of witness' I testimony that informant had told him that he had given defendant some kind of "content" to hold for him because statement was ambiguous in that it would require jury to speculate on what type of "content" was involved and statement did not bear directly on issue of whether defendant knew what he was hold-

ing and could have misled jury with regard to that issue); *United States v. Marvin,* 720 F.2d 12, 14 (8th Cir.1983) (upholding disallowance of testimony under Rule 403 because not sufficiently related to relevant issue and potentially misleading); *see also Petrocelli v. Gallison,* 679 F.2d 286, 292 (1st Cir.1982) (stating that where an item is so ambiguous as to leave a jury with no clue as to how to evaluate it, a trial judge is entitled to exclude the evidence under Fed.R.Evid. 403 on the ground that the danger of unfair prejudice from jury confusion substantially outweighed the record's probative value). Accordingly, we find that the nod is inadmissible under the above-outlined circumstances.

**B.** *Pointing to the Desk in Response to "Where is the money?"*

■ As already mentioned, when the agents entered Defendant's office, Defendant stated, "What is this about?" Special Agent Johnson replied, "It's about the money," and Rodríguez–Cabrera then nodded. Special Agent Johnson then asked, "Where is the money?" and Defendant pointed to the middle drawer of his desk.

We have no doubt that Special Agent Johnson's question, "Where is the money?" was a question that could elicit an incriminating response. We are, therefore, suppressing Rodríguez–Cabrera's statement pointing to the desk drawer because it was a statement made while in police custody, in response to an agent's interrogation, and without the necessary *Miranda* warnings.

**C.** *The Money*

After Defendant pointed to the desk in response to Special Agent Johnson's asking, "Where is the money?" Special Agent Johnson states that he asked Defendant "for his consent" to Johnson's searching the desk. Rodríguez–Cabrera replied that "there is no problem," and then opened the drawer himself, pulled out the money, and handed it to Johnson.

**1.** *Fruit–of–the–Poisonous–Tree Analysis*

■ Defendant moves to suppress the money pursuant to the "fruit-of-the-poison-

ous-tree" doctrine.[1] We assume, for purposes of this analysis only, that Special Agent Johnson's actions constituted custodial interrogation, triggering *Miranda* protections. Prior to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the admissibility of a defendant's in-custody statements depended solely on the traditional due process analysis, *i.e.*, whether the statements were given "voluntarily" within the meaning of the Due Process Clause. Voluntariness depends upon the method by which the statement was obtained. A statement given under circumstances which clearly prevented the suspect from exercising "a free and unconstrained will," *Haynes v. Washington*, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), would not be admitted into evidence. In *Miranda*, the Supreme Court added a further requirement to admit a statement into evidence, providing that a statement made while in custody must be suppressed if it was not preceded with adequate warnings. Thus, a statement is now admissible only if it was both voluntary within the meaning of the Due Process Clause and preceded by the appropriate warnings. However, *Miranda* warnings are only prophylactic measures meant to protect the Fifth–Amendment right against compulsory self-incrimination. *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).[2] *Miranda* warnings are "not themselves rights protected by the Constitution...." *Id.* Rather, *Miranda* warnings are a mere "practical reinforcement" for the Fifth Amendment. *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (citing *Michigan v. Tucker*, 417 U.S. at 444, 94 S.Ct. 2357). Therefore, "where there is no actual infringement of a suspect's constitutional rights, mere depar-

tures from the *Miranda* rule [do] not require the exclusion of derivative evidence." *United States v. Cherry*, 759 F.2d 1196, 1209 (5th Cir.1985) (citing *Oregon v. Elstad*, 470 U.S. 298, 308, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)).

This principle was first articulated in *Oregon v. Elstad*, 470 U.S. 298, 308–10, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The issue was whether a confession made after the police gave a suspect proper *Miranda* warnings was inadmissible on the ground that the police had earlier obtained an unwarned confession from the suspect. In *Elstad*, two officers went to the defendant's home with a warrant for his arrest. 470 U.S. at 300, 105 S.Ct. 1285. After arresting Elstad, but without "mirandizing" him, the officers questioned Elstad in his home about his role in the burglary of a neighbor's house. As a result of this interrogation, Elstad confessed to his involvement in the crime. *See id.* at 301, 105 S.Ct. 1285. The officers then escorted Elstad to the police station, where they advised him for the first time of his *Miranda* rights. After waiving his rights, the defendant once again confessed to the burglary. *See id.* Later, Elstad sought to suppress his second confession as the "fruit of the poisonous tree," arguing that it was obtained only as the result of his first confession that was made in violation of *Miranda*.

The Court explained that a *Miranda* violation is not a constitutional violation. Rather, *Miranda* warnings are non-constitutional prophylactic rules to insure that the right against compulsory self-incrimination is protected. The Court held that where there is no actual infringement of a suspect's constitutional rights, a violation of *Miranda* does

---

1. The Supreme Court first articulated the "fruit-of-the-poisonous-tree" doctrine in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The "fruit" is evidence derived from an illegal source, the poisonous tree. In *Wong Sun*, the Court held that evidence and witnesses discovered as a result of an illegal search is "tainted" and must be excluded. The *Wong Sun* doctrine also applies when the fruit of the Fourth–Amendment violation is not physical evidence, but a confession. *See Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).

2. In *Michigan v. Tucker*, the defendant asked the Court to suppress the testimony of a prosecution witness whose identity was discovered as a result of a voluntary statement taken in violation of Miranda. The Court refused to suppress the evidence, stating that since there was no actual infringement of the suspect's constitutional rights, the *Wong Sun* doctrine, *see supra*, note 2, was inapplicable.

not require the exclusion of the fruits of that violation. Thus, the Court ruled that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." *Elstad,* 470 U.S. at 318, 105 S.Ct. 1285.

*Elstad* specifically ruled on the admissibility of a suspect's warned, voluntary statement following a previous unwarned, voluntary confession. Thus, the "fruit" in *Elstad* was the second confession, and the poisonous tree was the first, unwarned confession. Nevertheless, the *Elstad* principle "is applicable regardless of whether the alleged fruit of a noncoercive Miranda violation is an article of evidence or the accused's own voluntary testimony." *United States v. Cherry,* 759 F.2d 1196, 1209 (5th Cir.1985).

We agree with the Fourth Circuit that "[a]lthough the Supreme Court has not specifically rejected application of the 'fruit of the poisonous tree' doctrine to physical evidence discovered as the result of a statement obtained in violation of *Miranda,* it is clear to us that the Court's reasoning in *Tucker* and *Elstad* compels that result.... The holdings in *Tucker* and *Elstad* could not be any clearer: The "tainted-fruits" analysis applies only when a defendant's constitutional rights have been infringed." [3] *United States v. Elie,* 111 F.3d 1135, 1141 (4th Cir.1997) (citing *United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1048 (9th Cir.1990)) (finding that the "tainted-fruits" doctrine does not apply to physical evidence obtained as a result of a

*Miranda* violation); *see also* Wayne R. La-Fave & Jerald H. Israel, CRIMINAL PROCEDURE § 9.5(b), at 201 (Supp.1991) (noting that "*Elstad* only rejected application of the fruits doctrine as applied to a subsequent confession" and stating that "there is much in the Court's opinion that suggests that the fruits doctrine should also be inapplicable to physical evidence acquired through a *Miranda-*violative confession").[4]

■ Accordingly, we hold that derivative evidence, either physical evidence or a voluntary statement, obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never "fruit of the poisonous tree." Thus, defendant's argument that the money must be suppressed as tainted fruit of the poisonous tree fails.

### 2. *Consent Exception to Warrant Requirement*

■ Next we examine the issue of the admissibility of the money in light of the consent exception to the warrant requirement. While incriminating statements obtained as a result of an officer's question designed to elicit such statements will be excluded as a clear violation of *Miranda,* evidence acquired as a result of an officer's request for a consent to search does not automatically require exclusion despite a *Miranda* violation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The rationale behind this principle is that a request for consent to search does not elicit any incriminating information

---

**3.** Prior to writing the majority opinion in *Elstad,* Justice O'Connor argued in another opinion against applying the "fruits-of-the-poisonous-tree" doctrine to physical evidence discovered as the result of a statement obtained in violation of *Miranda. See New York v. Quarles,* 467 U.S. 649, 660, 671 n. 4, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring) (noting that "nothing in *Miranda* or the privilege itself requires exclusion of nontestimonial evidence derived from informal custodial interrogation").

**4.** The First Circuit examined the *Elstad* principle in *United States v. Byram,* 145 F.3d 405, 409–10 (1st Cir.1998). In its analysis, the First Circuit cautioned that "*Elstad* discourages any promiscuous use of the fruits doctrine in ordinary Miranda cases." *Byram,* 145 F.3d at 410. Moreover, although *Byram,* as did *Elstad,* involved a

defendant's motion to suppress a second statement as alleged derivative evidence of a first statement that resulted from a *Miranda* violation, rather than derivative evidence of a physical nature, the court's analysis is instructive here:

> [E]lstad would be hard to confine to technical violations; its language emphasizing the voluntariness test as the prime safeguard is too powerful for that. But by the same token we think that *Elstad* does not wholly bar the door to excluding evidence derived from a Miranda violation—at least where the Miranda violation is not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate Miranda warning.

*Byram,* 145 F.3d at 409–10.

toward which the Fifth Amendment is direct. *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977). Rather, a request for consent merely relates to the preliminary question of the lawfulness of the search. A suspect's consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent may disclose incriminating evidence, this evidence is "real and physical, not testimonial." *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.1985); *see also United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir.1993) (holding that consenting to a search is not a self-incriminating statement and, "therefore, a request to search does not amount to interrogation").

■ First, we must determine whether Rodríguez–Cabrera provided consent to Special Agent Johnson voluntarily. Having examined the testimony and all of the documentary evidence, we find that Special Agent Johnson's interaction with Rodríguez–Cabrera on the issue of consent did not pose an interrogatory intended to elicit an incriminating response from Rodríguez–Cabrera, but merely requested his consent to search the desk for the money. We established earlier in this opinion that an officer may ask an arrested suspect to consent to a search despite the fact that no *Miranda* warnings have been given. Thus, the issue now becomes whether Rodríguez–Cabrera provided his consent voluntarily within the meaning of the Due Process clause.

■ Whether Rodríguez–Cabrera's consent was in fact voluntary or was the product of duress or coercion, express or implied, must be determined by the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also United States v. Kimball,* 25 F.3d 1, 8 (1st Cir.1994) (stating that "[t]he question of whether a defendant has consented to questioning by the police, and whether that consent was given volun-

tarily, are questions of fact to be determined from the totality of all of the circumstances") (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting that consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause")); *United States v. Miller,* 589 F.2d 1117, 1130 (1st Cir.1978); *United States v. Analla,* 975 F.2d 119, 125 (4th Cir.1992). The government bears the burden of proving that consent was voluntary. *Mendenhall,* 446 U.S. at 557, 100 S.Ct. 1870.

The atmosphere of the setting in which Rodríguez–Cabrera met the agents, interacted with them, and consented was in no way coercive. At the time of his arrest, Rodríguez–Cabrera was not in an unfamiliar setting, surrounded by a small army of agents pointing weapons at his head. Rather, he was sitting at his desk in his office with his chauffeur and staff close at hand. Special Agent Johnson approached, announced himself, and he and Special Agents Jack Montoya, William Burke, and Ivan Vitusek entered the room. Judging from the testimony and evidence, we find that Muñoz Camacho had already informed Rodríguez–Cabrera of Figueroa's arrest and was exiting the office at the time.[5] All agents, as is customary, were armed, although none brandished a weapon. At no time during the request for consent or the search was Rodríguez–Cabrera handcuffed.

We also take into account Rodríguez–Cabrera's expected personal susceptibility to coercion. Rodríguez–Cabrera is an intelligent, educated adult with an imposing presence. He is the mayor of a major municipality, an accomplished politician, and leader with island-wide recognition. Absent evidence to the contrary, he is necessarily charged with knowledge of basic law-enforcement procedure. *See United States v. Barnett,* 989 F.2d 546 (1st Cir.1993) (stating that

---

5. Rodríguez–Cabrera's chauffeur, Muñoz Camacho, testified that he stood one foot outside the door of the office and witnessed the agents tell Rodríguez–Cabrera "we can do this the easy way or the hard way," and frisk Rodríguez–Cabrera while roughly spreading his legs. Muñoz Camacho also stated that, during the arrest, he heard Rodríguez–Cabrera claim that the money be-

longed to Figueroa. Evaluating the demeanor of both Muñoz Camacho and Special Agent Johnson and the content of their respective testimonies, we conclude that Special Agent Johnson's account of that part of the incident is the more credible version, and base our decision accordingly.

voluntariness of consent to search turns on assessment of totality of circumstances, including factors bearing on vulnerability of consenting party, such as age, education, experience, and intelligence). Moreover, Special Agent Johnson testified that Rodríguez–Cabrera appeared to understand the question and in no way hesitated before reaching for the drawer.

Additionally, Rodríguez–Cabrera's consent is in no way ambiguous. Rodríguez–Cabrera did not respond to Special Agent Johnson's request for consent to search the desk with a mere shrug of indifference or a vacant look. Rather, in the absence of any explicit or implicit threat, Rodríguez–Cabrera himself reached into the desk drawer, retrieved the envelope of money, and handed it over to Johnson. *See U.S. v. Garcia–Rosa,* 876 F.2d 209 (1st Cir.1989) (holding that defendant consented to officers' warrantless search for guns when, in response to officer's question as to whether he had any firearms in home, he instructed wife to turn over guns to officers), *vacated on other grounds, Rivera–Feliciano v. U.S.,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990); *United States v. Miller,* 589 F.2d 1117 (1st Cir.1978) (finding that defendant impliedly consented to the search of luggage found in his truck when he unlocked his truck for police officer and after disclaiming any knowledge or interest in the luggage, unlocked the bag which contained contraband). Examining the totality of the circumstances, it is clear that Rodríguez–Cabrera knowingly and voluntarily offered the evidence to Special Agent Johnson. Rodríguez–Cabrera's will was not "overborne so that the statement was not his free and voluntary act." *United States v. Jackson,* 918 F.2d 236, 241 (1st Cir.1990) (internal quotation marks and citation omitted).

### B. *Inevitable Discovery*

▮ In the present case, Rodríguez–Cabrera handed over the money to Special Agent Johnson after being arrested and without having been advised of his *Miranda* rights. Defense counsel argues that the agents should have advised Rodríguez–Cabrera of his *Miranda* rights immediately upon his arrest. Ideally, the warnings should always precede other interventions; however, that is not what happened. The situation on November 24 was undeniably tense as the agents had to maneuver through the hundred-and-fifty-strong crowd gathered in the town square in front of City Hall. When the agents, clad in their FBI raid jackets, approached City Hall, the crowd also started moving towards the building. Upon entering the building, the agents encountered numerous members of Rodríguez–Cabrera's staff. After the agents entered Rodríguez–Cabrera's office, members of Rodríguez–Cabrera's staff were pounding on the walls and screaming. Undeniably, this was a tense, chaotic atmosphere. Nonetheless, the agents knew the money was in the building and, despite the confusion, were determined to recover it. So, although it can be argued that the agents' actions are not paragons of textbook professionalism, unpredictable field work does not always rise to these levels. *See Elstad,* 470 U.S. at 309, 105 S.Ct. 1285 (stating that " '[P]olicemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever.' ") *Michigan v. Tucker, supra,* [417 U.S.,] at 446 [94 S.Ct., at 2364]; *Tucker,* 417 U.S. at 446, 94 S.Ct. 2357 (stating "Before we penalize police error … we must consider whether the sanction serves a valid and useful purpose"). ("If errors are made by law-enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself."). Casting the context of the events and circumstances aside for the moment, we turn to the pressing issue of whether the agents would have obtained the money by other lawful means.

In the alternative, we rest our holding on the doctrine of inevitable discovery. This doctrine allows for the admission of illegally-obtained evidence in cases where it is shown by "demonstrated historical facts" that an independent and untainted discovery would inevitably have occurred. *U.S. v. Silvestri,* 787 F.2d 736 (1st Cir.1986) (citing *Nix v. Williams,* 467 U.S. 431, 445 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The key concept for inevitable discovery is that the evidence *would* have been found. Maguire,

"How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule," 55 J.Crim.L.C. & P.S. 307, 315 (1964); LaFave, SEARCH AND SEIZURE § 11.4(a) at 247 (3d ed.1996). The inquiry focuses not on whether the police acquired the information by relying upon an untainted source, but instead whether the illegally obtained evidence would have inevitably been lawfully discovered. *Id.* at 241. In order to maintain the integrity of the exclusionary rule, courts generally hold that the discovered evidence must "arise from circumstances other than those disclosed by the illegal search itself." *U.S. v. Thomas,* 955 F.2d 207 (4th Cir.1992).

The rationale underlying the doctrine of inevitable discovery is that if the information "ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix,* 467 U.S. at 443, 104 S.Ct. 2501. "Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Id.* at 446, 104 S.Ct. 2501. The goal of the doctrine is neither to put the prosecution in a better position than it would have been if the illegal action had not occurred, nor to put it in a worse position merely as a result of police misconduct or error. *Id.* at 446–47, 104 S.Ct. 2501.

The First Circuit has clearly rejected any hard, fast rules for application of the inevitable-discovery doctrine, stating that the "analysis should focus on questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented." *Silvestri,* 787 F.2d at 746. The First Circuit has noted three basic concerns in inevitable discovery exception inquiries: (1) whether the legal means are truly independent; (2) whether both the use of the legal means and discovery of the evidence by those means are inevitable; and (3) whether application of the inevitable-discovery exception either provides an incentive for police misconduct or significant-

ly weakens Fourth–Amendment protections. *Id.* at 744.

■ While it is true, as a general principle, that police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one, *United States v. Griffin,* 502 F.2d 959, 961 (6th Cir.1974), in this case the agents *knew for a fact* that the money was in City Hall in Rodríguez–Cabrera's actual or constructive possession. It is clear that had Rodríguez–Cabrera not turned over the money to the agents, the agents would have simply obtained a search warrant.[6] The agents had marked the money, given it to the CW who gave it to Figueroa, and followed it from the San Juan Marriott in Condado to City Hall in Toa Alta. With the evidence on the audio tapes, the cooperating witness, and the marked bills, it is evident that the agents had substantial probable cause to believe that Rodríguez–Cabrera had committed a crime and would have undoubtedly secured a search warrant and recovered the evidence had Rodríguez–Cabrera not readily supplied it to them.

The First Circuit opinion in *U.S. v. Ford,* 22 F.3d 374 (1st Cir.1994), is instructive here. In *Ford,* postal workers contacted local police after they detected a regular stream of narcotics being delivered to the defendant. The police, after verifying that the package contained illegal contraband, waited for the defendant at the post office and then followed him to his home. After the defendant had entered his home with the package, the authorities knocked on the door, lured defendant outside, and arrested him. The authorities asked for permission to search the house, which defendant denied. Subsequently, defendant asked to enter his house to change clothes and use the bathroom. The authorities informed defendant that he could not go back inside unaccompanied. The defendant and four law-enforcement officials then entered the premises and the officials performed a protective sweep. The authorities found the original package from the post office, marijuana plants, and drug parapher-

---

6. We note that the agents did not know where Figueroa was going with the money, they only knew he was taking it to Rodríguez–Cabrera. Therefore, the agents did not apply for a search warrant beforehand as they could not anticipate the location such a warrant would encompass.

nalia. The First Circuit held that the inevitable discovery rule applied to the evidence found during the warrantless protective sweep. The court reasoned that since the officers had undisputed independent evidence constituting probable cause to search the house, the seized evidence would undoubtedly have been discovered following an authorized search. Thus, the First Circuit concluded that the evidence would inevitably have been discovered, since "the existence of probable cause would find fruition in the issuance of a search warrant." *Id.* at 378.

We find the present case to be analogous to *Ford.* Here, as in *Ford,* the authorities knew the evidence was in the defendant's hands, by sight in *Ford* and by telephone confirmation in our case. In both cases, there was sufficient independent information in the hands of the authorities which would have provided probable cause to issue a search warrant. Had Rodríguez–Cabrera not given Special Agent Johnson the envelope with the money, the agents would have obtained a search warrant through the multitude of compelling evidence their investigation had thus far revealed. We do not doubt that, had Rodríguez–Cabrera not consented to the search, the agents would have obtained a search warrant. Particularly persuasive is the fact that the FBI agents themselves supplied the money, and followed the money so that they knew its whereabouts. In this situation, the agents were not going to leave the premises without that money.

We now turn to the three concerns in inevitable-discovery cases as articulated by the First Circuit: (1) whether the legal means are truly independent; (2) whether both the use of the legal means and discovery of the evidence by those means are inevitable; and (3) whether application of the inevitable discovery exception either provides an incentive for police misconduct or significantly weakens Fourth Amendment protections. *Silvestri* at 744. The legal means are clearly independent in this case. The information supplied by the cooperating witness, the numerous taped exchanges, and the marked bills are pieces of evidence all clearly independent of the agents' asking Rodríguez–Cabrera for consent to search his desk.

Additionally, the second concern is met. As discussed above, had Rodríguez–Cabrera not turned over the money, a search warrant would have been issued, the desk would have been searched, and the money inevitably would have been found. Finally, we do not find that application of the inevitable discovery exception in this case would encourage police misconduct or strike a meaningful blow to Fourth–Amendment protections. The FBI agents were not running amok in an aimless search of Rodríguez–Cabrera's office or rummaging about in a frenzied attempt to gather incriminating evidence. Instead, Special Agent Johnson asked for consent and Rodríguez–Cabrera himself handed over the money. One of the main purposes of the Fourth Amendment and the exclusionary rule is to deter unlawful police conduct in the search for evidence while still protecting individuals' right to be free from unreasonable invasions of personal privacy. The type of search antithetical to the Fourth Amendment is simply not present here. Permitting the admission of the money, in light of the circumstances here, does not violate Rodríguez–Cabrera's rights or the general principles behind the Fourth Amendment. No valid and useful purpose would be served by disregarding this evidence, and to exclude it would only unfairly penalize the government and the agents.

## V.

### Conclusion

In light of the foregoing analysis, we **GRANT** Defendant's motion to suppress the nod and the pointing to the desk in response to "Where's the money?", and **DENY** Defendant's motion to suppress the money.

**IT IS SO ORDERED.**